FloridaRealtors®

# Vacant Land Contract

1. **Sale and Purchase ("Contract"):** 331 Freeport Partners, LLC, a Florida limited liability company (**"Seller"**) and 331 Partners, LLC, a Georgia limited liability company (**"Buyer"**) (the "parties") agree to sell and buy on the terms and conditions specified below the property ("Property") described as:
Address: Hwy 331 Freeport Florida being 1034.89 acres, more or less
Legal Description: See Exhibit "B" - Legal Descriptions
SEC ___/TWP /___/RNG ___ of __________ County, Florida. Real Property ID No.: __________
including all improvements existing on the Property and the following additional property: n/a

2. **Purchase Price:** (U.S. currency) ........................................ $ see Exhibit "A"
All deposits will be made payable to "Escrow Agent" named below and held in escrow by:
Escrow Agent's Name: First American Title Insurance Company
Escrow Agent's Contact Person: Nancy O. Hansa
Escrow Agent's Address: 2301 Maitland Center Parkway, Suite 450, Maitland, FL 32751
Escrow Agent's Phone: __________
Escrow Agent's Email: __________
 **(a)** Initial deposit ($0 if left blank) (**Check if applicable**)
 ☐ accompanies offer
 ☒ will be delivered to Escrow Agent within 3 business days (3 days if left blank) after Effective Date ........................................ $ 50,000.00
 **(b)** Additional deposit will be delivered to Escrow Agent (**Check if applicable**)
 ☐ within ______ days (10 days if left blank) after Effective Date
 ☒ within 3 business days (3 days if left blank) after expiration of Due Diligence Period ....... $ 200,000.00
 **(c)** Total Financing (see Paragraph 6) (express as a dollar amount or percentage) ................. n/a
 **(d)** Other: n/a ........... $ ______
 **(e)** Balance to close (not including **Buyer's** closing costs, prepaid items, and prorations) to be paid at closing by wire transfer or other Collected funds ........................................ $ See Exhibit "A"
 **(f)** ☐ (Complete only if purchase price will be determined based on a per unit cost instead of a fixed price.) The unit used to determine the purchase price is ☐ lot ☒ acre ☐ square foot ☐ other (specify): See exhibit A prorating areas of less than a full unit. The purchase price will be $ See Exhibit "A" per unit based on a calculation of total area of the Property as certified to **Seller** and **Buyer** by a Florida licensed surveyor in accordance with Paragraph 8(c). The following rights of way and other areas will be excluded from the calculation: Easements of Record

3. **Time for Acceptance; Effective Date:** Unless this offer is signed by **Seller** and **Buyer** and an executed copy delivered to all parties on or before __________, this offer will be withdrawn and **Buyer's** deposit, if any, will be returned. The time for acceptance of any counter-offer will be 3 days after the date the counter-offer is delivered. **The "Effective Date" of this Contract is the date on which the last one of the Seller and Buyer has signed or initialed and delivered this offer or the final counter-offer.**

4. **Closing Date:** This transaction will close on see Exhibit "A" ("Closing Date"), unless specifically extended by other provisions of this Contract. The Closing Date will prevail over all other time periods including, but not limited to, Financing and Feasibility Study periods. However, if the Closing Date occurs on a Saturday, Sunday, or national legal holiday, it will extend to 5:00 p.m. (where the Property is located) of the next business day. In the event insurance underwriting is suspended on Closing Date and **Buyer** is unable to obtain property insurance, **Buyer** may postpone closing for up to 5 days after the insurance underwriting suspension is lifted. If this transaction does not close for any reason, **Buyer** will immediately return all **Seller** provided documents and other items.

5. **Extension of Closing Date:** If Paragraph 6(b) is checked and Closing Funds from Buyer's lender(s) are not available on Closing Date due to Consumer Financial Protection Bureau Closing Disclosure delivery requirements


©2021 Florida Realtors®
Form Simplicity

("CFPB Requirements"), if applicable, then Closing Date shall be extended for such period necessary to satisfy CFPB Requirements, provided such period shall not exceed 10 days.

6. **Financing:** (**Check as applicable**)
(a) ☒ **Buyer** will pay cash for the Property with no financing contingency.
(b) ☐ This Contract is contingent on **Buyer** qualifying for and obtaining the commitment(s) or approval(s) specified below ("Financing") within __n/a__ days after Effective Date (Closing Date or 30 days after Effective Date, whichever occurs first, if left blank) ("Financing Period"). **Buyer** will apply for Financing within __n/a__ days after Effective Date (5 days if left blank) and will timely provide any and all credit, employment, financial, and other information required by the lender. If **Buyer**, after using diligence and good faith, cannot obtain the Financing within the Financing Period, either party may terminate this Contract and **Buyer's** deposit(s) will be returned.

(1) ☐ **New Financing: Buyer** will secure a commitment for new third party financing for $____________ or ______% of the purchase price at (**Check one**) ☐ a fixed rate not exceeding ______% ☐ an adjustable interest rate not exceeding ______% at origination (a fixed rate at the prevailing interest rate based on **Buyer's** creditworthiness if neither choice is selected). **Buyer** will keep **Seller** and Broker fully informed of the loan application status and progress and authorizes the lender or mortgage broker to disclose all such information to **Seller** and Broker.

(2) ☐ **Seller Financing: Buyer** will execute a ☐ first ☐ second purchase money note and mortgage to **Seller** in the amount of $____________, bearing annual interest at ______% and payable as follows: ______n/a______
The mortgage, note, and any security agreement will be in a form acceptable to **Seller** and will follow forms generally accepted in the county where the Property is located; will provide for a late payment fee and acceleration at the mortgagee's option if **Buyer** defaults; will give **Buyer** the right to prepay without penalty all or part of the principal at any time(s) with interest only to date of payment; will be due on conveyance or sale; will provide for release of contiguous parcels, if applicable; and will require **Buyer** to keep liability insurance on the Property, with **Seller** as additional named insured. **Buyer** authorizes **Seller** to obtain credit, employment, and other necessary information to determine creditworthiness for the financing. **Seller** will, within 10 days after Effective Date, give **Buyer** written notice of whether or not **Seller** will make the loan.

(3) ☐ **Mortgage Assumption: Buyer** will take title subject to and assume and pay existing first mortgage to ______n/a______
LN#____________ in the approximate amount of $____________ currently payable at $____________ per month, including principal, interest, ☐ taxes and insurance, and having a ☐ fixed ☐ other (describe) ____________ interest rate of ______% which ☐ will ☐ will not escalate upon assumption. Any variance in the mortgage will be adjusted in the balance due at closing with no adjustment to purchase price. **Buyer** will purchase **Seller's** escrow account dollar for dollar. If the interest rate upon transfer exceeds ______% or the assumption/transfer fee exceeds $____________, either party may elect to pay the excess, failing which this Contract will terminate; and **Buyer's** deposit(s) will be returned. If the lender disapproves **Buyer**, this Contract will terminate; and **Buyer's** deposit(s) will be returned.

7. **Assignability:** (**Check one**) **Buyer** ☒ may assign and thereby be released from any further liability under this Contract, ☐ may assign but not be released from liability under this Contract, or ☐ may not assign this Contract. See Exhibit "A"

8. **Title: Seller** has the legal capacity to and will convey marketable title to the Property by ☐ statutory warranty deed ☒ special warranty deed ☐ other (specify) ____________, free of liens, easements, and encumbrances of record or known to **Seller**, but subject to property taxes for the year of closing; covenants, restrictions, and public utility easements of record; existing zoning and governmental regulations; and (list any other matters to which title will be subject) ____________, provided there exists at closing no violation of the foregoing.
(a) **Title Evidence:** The party who pays for the owner's title insurance policy will select the closing agent and pay for the title search, including tax and lien search (including municipal lien search) if performed, and all other fees charged by closing agent. **Seller** will deliver to **Buyer**, at
(**Check one**) ☒ **Seller's** ☐ **Buyer's** expense and
(**Check one**) ☒ within __15__ days after Effective Date ☐ at least ______ days before Closing Date,
(**Check one**)
(1) ☒ a title insurance commitment by a Florida licensed title insurer setting forth those matters to be discharged by **Seller** at or before closing and, upon **Buyer** recording the deed, an owner's policy in the


©2021 Florida Realtors®
Form Simplicity

amount of the purchase price for fee simple title subject only to the exceptions stated above. If **Buyer** is paying for the owner's title insurance policy and **Seller** has an owner's policy, **Seller** will deliver a copy to **Buyer** within 15 days after Effective Date.

**(2)** ☐ an abstract of title, prepared or brought current by an existing abstract firm or certified as correct by an existing firm. However, if such an abstract is not available to **Seller**, then a prior owner's title policy acceptable to the proposed insurer as a base for reissuance of coverage may be used. The prior policy will include copies of all policy exceptions and an update in a format acceptable to **Buyer** from the policy effective date and certified to **Buyer** or **Buyer's** closing agent together with copies of all documents recited in the prior policy and in the update. If such an abstract or prior policy is not available to **Seller**, then (1) above will be the title evidence.

**(b) Title Examination:** After receipt of the title evidence, **Buyer** will, within __30__ days (10 days if left blank) ~~but no later than Closing Date~~, deliver written notice to **Seller** of title defects. Title will be deemed acceptable to **Buyer** if (i) **Buyer** fails to deliver proper notice of defects or (ii) **Buyer** delivers proper written notice and **Seller** cures the defects within __60__ days (30 days if left blank) ("Cure Period") after receipt of the notice. ~~If the defects are cured within the Cure Period, closing will occur within 10 days after receipt by **Buyer** of notice of such cure~~. **Seller** may elect not to cure defects if **Seller** reasonably believes any defect cannot be cured within the Cure Period. If the defects are not cured within the Cure Period, **Buyer** will have 10 days after receipt of notice of **Seller's** inability to cure the defects to elect whether to terminate this Contract or accept title subject to existing defects and close the transaction without reduction in purchase price.

**(c) Survey: Buyer** may, at **Buyer's** expense, have the Property surveyed and must deliver written notice to **Seller**, within 5 days after receiving survey but not later than 5 days before Closing Date, of any encroachments on the Property, encroachments by the Property's improvements on other lands, or deed restriction or zoning violations. Any such encroachment or violation will be treated in the same manner as a title defect and **Seller's** and **Buyer's** obligations will be determined in accordance with Paragraph 8(b).

**(d) Ingress and Egress: Seller** warrants that the Property presently has ingress and egress.

**9. Property Condition: Seller** will deliver the Property to **Buyer** at closing in its present "as is" condition, with conditions resulting from **Buyer's** Inspections and casualty damage, if any, excepted. **Seller** will not engage in or permit any activity that would materially alter the Property's condition without the **Buyer's** prior written consent.

**(a) Inspections: (Check (1) or (2))**

**(1)** ☐ **Due Diligence Period: Buyer** will, at **Buyer's** expense and within __see Exhibit "A"__ days (30 days if left blank) ("Due Diligence Period") after Effective Date and in **Buyer's** sole and absolute discretion, determine whether the Property is suitable for **Buyer's** intended use. During the Due Diligence Period, **Buyer** may conduct a Phase 1 environmental assessment and any other tests, analyses, surveys, and investigations ("Inspections") that **Buyer** deems necessary to determine to **Buyer's** satisfaction the Property's engineering, architectural, and environmental properties; zoning and zoning restrictions; subdivision statutes; soil and grade; availability of access to public roads, water, and other utilities; consistency with local, state, and regional growth management plans; availability of permits, government approvals, and licenses; and other inspections that **Buyer** deems appropriate. If the Property must be rezoned, **Buyer** will obtain the rezoning from the appropriate government agencies. **Seller** will sign all documents **Buyer** is required to file in connection with development or rezoning approvals. **Seller** gives **Buyer**, its agents, contractors, and assigns, the right to enter the Property at any time during the Due Diligence Period for the purpose of conducting Inspections, provided, however, that **Buyer**, its agents, contractors, and assigns enter the Property and conduct Inspections at their own risk. **Buyer** will indemnify and hold **Seller** harmless from losses, damages, costs, claims, and expenses of any nature, including attorneys' fees, expenses, and liability incurred in application for rezoning or related proceedings, and from liability to any person, arising from the conduct of any and all Inspections or any work authorized by **Buyer**. **Buyer** will not engage in any activity that could result in a construction lien being filed against the Property without **Seller's** prior written consent. If this transaction does not close, **Buyer** will, at **Buyer's** expense, (i) repair all damages to the Property resulting from the Inspections and return the Property to the condition it was in before conducting the Inspections and (ii) release to **Seller** all reports and other work generated as a result of the Inspections.

Before expiration of the Due Diligence Period, **Buyer** must deliver written notice to **Seller** of **Buyer's** determination of whether or not the Property is acceptable. **Buyer's** failure to comply with this notice requirement will constitute acceptance of the Property as suitable for **Buyer's** intended use in its "as is" condition. If the Property is unacceptable to **Buyer** and written notice of this fact is timely delivered to **Seller**, this Contract will be deemed terminated, and **Buyer's** deposit(s) will be returned.

(2) ☐ **No Due Diligence Period: Buyer** is satisfied that the Property is suitable for **Buyer's** purposes, including being satisfied that either public sewerage and water are available to the Property or the Property will be approved for the installation of a well and/or private sewerage disposal system and that existing zoning and other pertinent regulations and restrictions, such as subdivision or deed restrictions, concurrency, growth management, and environmental conditions, are acceptable to **Buyer**. This Contract is not contingent on **Buyer** conducting any further investigations.

**(b) Government Regulations:** Changes in government regulations and levels of service which affect **Buyer's** intended use of the Property will not be grounds for terminating this Contract if the Due Diligence Period has expired or if Paragraph 9(a)(2) is selected.

**(c) Flood Zone: Buyer** is advised to verify by survey, with the lender, and with appropriate government agencies which flood zone the Property is in, whether flood insurance is required, and what restrictions apply to improving the Property and rebuilding in the event of casualty.

**(d) Coastal Construction Control Line ("CCCL"):** If any part of the Property lies seaward of the CCCL as defined in Section 161.053, Florida Statutes, **Seller** will provide **Buyer** with an affidavit or survey as required by law delineating the line's location on the Property, unless **Buyer** waives this requirement in writing. The Property being purchased may be subject to coastal erosion and to federal, state, or local regulations that govern coastal property, including delineation of the CCCL, rigid coastal protection structures, beach nourishment, and the protection of marine turtles. Additional information can be obtained from the Florida Department of Environmental Protection, including whether there are significant erosion conditions associated with the shore line of the Property being purchased.

☐ **Buyer** waives the right to receive a CCCL affidavit or survey.

**10. Closing Procedure; Costs:** Closing will take place in the county where the Property is located and may be conducted by mail or electronic means. If title insurance insures **Buyer** for title defects arising between the title binder effective date and recording of **Buyer's** deed, closing agent will disburse at closing the net sale proceeds to **Seller** (in local cashier's check if **Seller** requests in writing at least 5 days before closing) and brokerage fees to Broker as per Paragraph 21. In addition to other expenses provided in this Contract, **Seller** and **Buyer** will pay the costs indicated below.

**(a) Seller Costs:**

Taxes on deed
Recording fees for documents needed to cure title
Title evidence (if applicable under Paragraph 8)
Estoppel Fee(s)
Other: Sellers Legal Counsel, except Paragraph 17 herein & 50% of the escrow fee charged by escrow agent

**(b) Buyer Costs:**

Taxes and recording fees on notes and mortgages
Recording fees on the deed and financing statements
Loan expenses
Title evidence (if applicable under Paragraph 8)
Lender's title policy at the simultaneous issue rate
Inspections
Survey
Insurance
Other: Buyers Legal Counsel, except Paragraph 17 herein & 50% of the escrow fee charged by escrow agen

**(c) Prorations:** The following items will be made current and prorated as of the day before Closing Date: real estate taxes (including special benefit tax liens imposed by a CDD), interest, bonds, assessments, leases, and other Property expenses and revenues. If taxes and assessments for the current year cannot be determined, the previous year's rates will be used with adjustment for any exemptions.

**(d) Special Assessment by Public Body:** Regarding special assessments imposed by a public body, **Seller** will pay (i) the full amount of liens that are certified, confirmed, and ratified before closing and (ii) the amount of the last estimate of the assessment if an improvement is substantially completed as of Effective Date but has not resulted in a lien before closing; and **Buyer** will pay all other amounts. If special assessments may be paid in installments, ☒ **Seller** ☐ **Buyer** (**Buyer** if left blank) will pay installments due after closing. If **Seller** is checked, **Seller** will pay the assessment in full before or at the time of closing. Public body does not include a Homeowners' or Condominium Association.

**(e) PROPERTY TAX DISCLOSURE SUMMARY: BUYER** SHOULD NOT RELY ON THE **SELLER'S** CURRENT PROPERTY TAXES AS THE AMOUNT OF PROPERTY TAXES THAT **BUYER** MAY BE OBLIGATED TO PAY IN THE YEAR SUBSEQUENT TO PURCHASE. A CHANGE OF OWNERSHIP OR PROPERTY


©2021 Florida Realtors®
Form Simplicity

IMPROVEMENTS TRIGGERS REASSESSMENTS OF THE PROPERTY THAT COULD RESULT IN HIGHER PROPERTY TAXES. IF YOU HAVE ANY QUESTIONS CONCERNING VALUATION, CONTACT THE COUNTY PROPERTY APPRAISER'S OFFICE FOR FURTHER INFORMATION.

(f) **Foreign Investment in Real Property Tax Act ("FIRPTA"):** If **Seller** is a "foreign person" as defined by FIRPTA, **Seller** and **Buyer** will comply with FIRPTA, which may require **Seller** to provide additional cash at closing.

(g) **1031 Exchange:** If either **Seller** or **Buyer** wish to enter into a like-kind exchange (either simultaneously with closing or after) under Section 1031 of the Internal Revenue Code ("Exchange"), the other party will cooperate in all reasonable respects to effectuate the Exchange including executing documents, provided, however, that the cooperating party will incur no liability or cost related to the Exchange and that the closing will not be contingent upon, extended, or delayed by the Exchange.

**11. Computation of Time:** Calendar days will be used when computing time periods, except time periods of 5 days or less. Time periods of 5 days or less will be computed without including Saturday, Sunday, or national legal holidays specified in 5 U.S.C. 6103(a). Other than time for acceptance and Effective Date as set forth in Paragraph 3, any time periods provided for or dates specified in this Contract, whether preprinted, handwritten, typewritten or inserted herein, which shall end or occur on a Saturday, Sunday, or national legal holiday (see 5 U.S.C. 6103) shall extend until 5:00 p.m. (where the Property is located) of the next business day. **Time is of the essence in this Contract.**

**12. Risk of Loss; Eminent Domain:** If any portion of the Property is materially damaged by casualty before closing or **Seller** negotiates with a governmental authority to transfer all or part of the Property in lieu of eminent domain proceedings or an eminent domain proceeding is initiated, **Seller** will promptly inform **Buyer**. Either party may terminate this Contract by written notice to the other within 10 days after **Buyer's** receipt of **Seller's** notification, and **Buyer's** deposit(s) will be returned, failing which **Buyer** will close in accordance with this Contract and receive all payments made by the governmental authority or insurance company, if any.

**13. Force Majeure:** **Seller** or **Buyer** will not be required to perform any obligation under this Contract or be liable to each other for damages so long as the performance or non-performance of the obligation is delayed, caused, or prevented by an act of God or force majeure. An "act of God or "force majeure" is defined as hurricanes, earthquakes, floods, fire, unusual transportation delays, wars, insurrections, and any other cause not reasonably within the control of **Seller** or **Buyer** and which by the exercise of due diligence the non-performing party is unable in whole or in part to prevent or overcome. All time periods, including Closing Date, will be extended for the period that the act of God or force majeure is in place. However, in the event that such act of God or force majeure event continues beyond 30 days, either party may terminate this Contract by delivering written notice to the other; and **Buyer's** deposit(s) will be returned.

**14. Notices:** All notices will be in writing and delivered to the parties and Broker by mail, personal delivery, or electronic means. **Buyer's failure to timely deliver written notice to Seller, when such notice is required by this Contract, regarding any contingency will render that contingency null and void, and this Contract will be construed as if the contingency did not exist. Any notice, document, or item delivered to or received by an attorney or licensee (including a transactions broker) representing a party will be as effective as if delivered to or received by that party.**

**15. Complete Agreement; Persons Bound:** This Contract is the entire agreement between **Seller** and **Buyer**. **Except for brokerage agreements, no prior or present agreements will bind Seller, Buyer, or Broker unless incorporated into this Contract.** Modifications of this Contract will not be binding unless in writing, signed or initialed, and delivered by the party to be bound. Electronic signatures will be acceptable and binding. This Contract, signatures, initials, documents referenced in this Contract, counterparts, and written modifications communicated electronically or on paper will be acceptable for all purposes, including delivery, and will be binding. Handwritten or typewritten terms inserted in or attached to this Contract prevail over preprinted terms. If any provision of this Contract is or becomes invalid or unenforceable, all remaining provisions will continue to be fully effective. **Seller** and **Buyer** will use diligence and good faith in performing all obligations under this Contract. This Contract will not be recorded in any public record. The terms "**Seller**," "**Buyer**," and "Broker" may be singular or plural. This Contract is binding on the heirs, administrators, executors, personal representatives, and assigns, if permitted, of **Seller**, **Buyer**, and Broker.

**16. Default and Dispute Resolution:** This Contract will be construed under Florida law. This Paragraph will survive closing or termination of this Contract.

(a) **Seller Default:** If **Seller** fails, neglects, or refuses to perform **Seller's** obligations under this Contract, **Buyer** may elect to receive a return of **Buyer's** deposit(s) without thereby waiving any action for damages resulting


©2021 Florida Realtors®
Form Simplicity

from **Seller's** breach and may seek to recover such damages or seek specific performance. **Seller** will also be liable for the full amount of the brokerage fee. on terms provided by the controlling Fee Agreement.

**(b) Buyer Default:** If **Buyer** fails, neglects, or refuses to perform **Buyer's** obligations under this Contract, including payment of deposit(s), within the time(s) specified, **Seller** may elect to recover and retain the deposit(s), paid and agreed to be paid, for the account of **Seller** as agreed upon liquidated damages, consideration for execution of this Contract, and in full settlement of any claims, whereupon **Seller** and **Buyer** will be relieved from all further obligations under this Contract; or **Seller**, at **Seller's** option, may proceed in equity to enforce **Seller's** rights under this Contract.

**17. Attorney's Fees; Costs:** In any litigation permitted by this Contract, the prevailing party shall be entitled to recover from the non-prevailing party costs and fees, including reasonable attorney's fees, incurred in conducting the litigation. This Paragraph 17 shall survive Closing or termination of this Contract.

**18. Escrow Agent; Closing Agent:** **Seller** and **Buyer** authorize Escrow Agent and closing agent (collectively "Agent") to receive, deposit, and hold funds and other items in escrow and, subject to Collection, disburse them upon proper authorization and in accordance with Florida law and the terms of this Contract, including disbursing brokerage fees. "Collection" or "Collected" means any checks tendered or received have become actually and finally collected and deposited in the account of Agent. The parties agree that Agent will not be liable to any person for misdelivery of escrowed items to **Seller** or **Buyer**, unless the misdelivery is due to Agent's willful breach of this Contract or gross negligence. If Agent interpleads the subject matter of the escrow, Agent will pay the filing fees and costs from the deposit and will recover reasonable attorneys' fees and costs to be paid from the escrowed funds or equivalent and charged and awarded as court costs in favor of the prevailing party.

**19. Professional Advice; Broker Liability:** Broker advises **Seller** and **Buyer** to verify all facts and representations that are important to them and to consult an appropriate professional for legal advice (for example, interpreting this Contract, determining the effect of laws on the Property and this transaction, status of title, foreign investor reporting requirements, the effect of property lying partially or totally seaward of the CCCL, etc.) and for tax, property condition, environmental, and other specialized advice. **Buyer** acknowledges that all representations (oral, written, or otherwise) by Broker are based on **Seller** representations or public records. **Buyer agrees to rely solely on Seller, professional inspectors, and government agencies for verification of the Property condition and facts that materially affect Property value. Seller** and **Buyer** respectively will pay all costs and expenses, including reasonable attorneys' fees at all levels, incurred by Broker and Broker's officers, directors, agents, and employees in connection with or arising from **Seller's** or **Buyer's** misstatement or failure to perform contractual obligations. **Seller** and **Buyer** hold harmless and release Broker and Broker's officers, directors, agents, and employees from all liability for loss or damage based on (i) **Seller's** or **Buyer's** misstatement or failure to perform contractual obligations; (ii) the use or display of listing data by third parties, including, but not limited to, photographs, images, graphics, video recordings, virtual tours, drawings, written descriptions, and remarks related to the Property; (iii) Broker's performance, at **Seller's** or **Buyer's** request, of any task beyond the scope of services regulated by Chapter 475, Florida Statutes, as amended, including Broker's referral, recommendation, or retention of any vendor; (iv) products or services provided by any vendor; and (v) expenses incurred by any vendor. **Seller** and **Buyer** each assume full responsibility for selecting and compensating their respective vendors. This Paragraph will not relieve Broker of statutory obligations. For purposes of this Paragraph, Broker will be treated as a party to this Contract. This Paragraph will survive closing.

**20. Commercial Real Estate Sales Commission Lien Act:** If the Property is commercial real estate as defined by Section 475.701, Florida Statutes, the following disclosure will apply: The Florida Commercial Real Estate Sales Commission Lien Act provides that when a broker has earned a commission by performing licensed services under a brokerage agreement with you, the broker may claim a lien against your net sales proceeds for the broker's commission. The broker's lien rights under the act cannot be waived before the commission is earned.

**21. Brokers:** The licensee(s) and brokerage(s) named below are collectively referred to as "Broker." **Instruction to closing agent: Seller** and **Buyer** direct Closing Agent to disburse at Closing the full amount of the brokerage fees as specified in separate brokerage agreements with the parties and cooperative agreements between the Brokers, except to the extent Broker has retained such fees from the escrowed funds. This Paragraph will not be used to modify any MLS or other offer of compensation made by **Seller** or listing broker to cooperating brokers.

* ______________________________ Kay Eubanks BK 30006743

**Seller's** Sales Associate/License No. **Buyer's** Sales Associate/License No.


©2021 Florida Realtors®
Form Simplicity

**Seller's** address for purpose of notice:
Address: Two Roads Develpment, LLC, 1217 S Flagler Dr, Ste 200, West Palm Beach, FL 33401-6706
Phone: 561-693-6686 Fax: 914-801-4667 Email: dhayes@tworoadsre.com

**Effective Date: ____________________ (The date on which the last party signed or initialed and delivered the final offer or counter offer.)**

Florida REALTORS® makes no representation as to the legal validity or adequacy of any provision of this form in any specific transaction. This standardized form should not be used in complex transactions or with extensive riders or additions. This form is available for use by the entire real estate industry and is not intended to identify the user as REALTOR®. REALTOR® is a registered collective membership mark which may be used only by real estate licensees who are members of the NATIONAL ASSOCIATION OF REALTORS® and who subscribe to its Code of Ethics. The copyright laws of United States (17 U.S. Code) forbid the unauthorized reproduction of this form by any means including facsimile or computerized forms.


©2021 Florida Realtors®
Form Simplicity

| Seller's Sales Associate Email Address | keubanks@thepropertygroup.org<br>Buyer's Sales Associate Email Address |
|---|---|
| Seller's Sales Associate Phone Number | 850-227-4636<br>Buyer's Sales Associate Phone Number |
| Listing Brokerage | The Property Group<br>Buyer's Brokerage |
| Listing Brokerage Address | PO Box 9689, Panama City Beach, FL 32417<br>Buyer's Brokerage Address |

**22. Addenda:** The following additional terms are included in the attached addenda and incorporated into this Contract (**Check if applicable**)

☐ A. Back-up Contract
☐ B. Kick Out Clause
☐ C. Other ______

**23. Additional Terms:** Exhibits "A" Additional Terms and Conditions, "B" Legal Description of Property, "C" Escrow Agent Acceptance and Agreement of Escrow Agent are each attached hereto and made part hereof by reference and shall control in the event of any conflict with this Vacant Land Contract. Partners and/or potential Partners of Buyer and Seller hold Real Estate Broker's Licenses.

**COUNTER-OFFER/REJECTION**

☐ Seller counters Buyer's offer (to accept the counter-offer, Buyer must sign or initial the counter-offered terms and deliver a copy of the acceptance to Seller).
☐ Seller rejects Buyer's offer

**This is intended to be a legally binding Contract. If not fully understood, seek the advice of an attorney before signing.**

**Buyer:** [signature] Date: July 6, 2021
Print name: 331 Partners, LLC a Georgia limited liability company by Don Carll its Authorized Representative
**Buyer:** ______ Date: ______
Print name: ______
**Buyer's** address for purpose of notice:
Address: 2600 Pleasantdale Road Ste 7, Atlanta GA 30340
Phone: 404-791-4343 Fax: ______ Email: donontheqo@gmail.com
**Seller:** By: [signature] Daniel G. Hayes, Manager Date: July 2, 2021
Print name: 331 Freeport Partners, LLC, a Florida limited liability company
**Seller:** ______ Date: ______
Print name: ______


©2021 Florida Realtors®
Form Simplicity

# EXHIBIT "A"

## Additional Terms and Conditions

---

This Exhibit "A" and the Exhibits that follow (each an "Exhibit" and together the "Exhibits") are attached to and incorporated into that certain Vacant Land Contract of even date herewith (as supplemented and amended, the "Contract" or the "Agreement") by and between **331 Freeport Partners, LLC**, a Florida limited liability company ("Seller"), and **331 Partners, LLC**, a Georgia limited liability company ("Buyer"). All terms and conditions contained in this Exhibit "A" and the other Exhibits shall control in the event of any conflict with anything contained in the Vacant Land Contract, which except as modified by the Exhibits shall remain unchanged and in full force and effect.

1) Purchase Price. The Purchase Price for the Property shall be determined as either: (a) a price set for a single closing purchase of the entire Property at the initial closing ("One Closing Price"); or (b) a price set for up to four (4) installment purchases ("Installment Price") as set forth below. The Buyer shall have the right (but no obligation) to elect, by written notice delivered to Seller at any time up the date thirty (30) days before the first scheduled closing, whether to pay the One Closing Price and close on the entire Property at the first scheduled closing ("One Closing Election"); in the absence of such timely election and notice the Purchase Price shall be at the Installment Price.

1.1) One Closing Price at the First (1st) Scheduled Closing.

If Buyer has made the One Closing Election to purchase the entire Property at the first scheduled closing, the purchase price paid to Seller (the "One Closing Price") shall be Nineteen Thousand Three Hundred Twenty-Five and 73/100 Dollars ($ 19,325.73) per acre, as determined by a Florida licensed surveyor acceptable to both Buyer and Seller. The parties understand and agree that the estimate of the Seller's "total acreage" is One Thousand Thirty-Four and 89/100 (1,034.89 +/-) acres; therefore, the estimated One Closing Price would be approximately Twenty Million Dollars ($20,000,000).

1.2) Installment Price for Property.

If Buyer does not make the One Closing Election to purchase the entire Property at the first scheduled closing then the Property will be sold to Buyer in installments as described below and the purchase price paid for installment sales shall be Twenty-Two Thousand Five Hundred Thirty-Five and 97/100 Dollars ($ 22,535.97) per acre, as determined by a Florida licensed surveyor acceptable to both Buyer and Seller. The parties understand and agree that the estimate of the Seller's "total acreage" is One Thousand Thirty-Four and 89/100 (1,034.89 +/-) acres; therefore, the estimated aggregate purchase

price at the Installment Price would be approximately Twenty-Three Million Three Hundred Thirty-Two Thousand Two Hundred Fifty Dollars ($23,332,250).

Unless the parties close on the entire Property at the first scheduled closing after a One Closing Election, the Buyer and Seller agree that the Buyer shall purchase the Property in up to four (4) installments with the identified acreage determined as set forth below.

The price per acre for all land conveyed at the Installment Price shall be Twenty-Two Thousand Five Hundred Thirty-Five and 97/100 Dollars ($22,535.97) (the "Installment Price").

The Buyer will determine the portion of the Property taken down at each installment closing (the "Designated Takedown") provided:

(a) each installment shall be for not less than one-quarter of the entire Property governed hereby, that is approximately Two Hundred Fifty-Eight and seven-tenths (258.7) acres [except if at the final closing the balance of the Property is less, then the balance of the Property];

(b) to the extent possible, the Designated Takedown will be in contiguous acreage that does not isolate or strand the remaining acreage or create segregated parcels separate from the balance of the Property;

(c) the Designated Takedown shall include both wetlands and uplands in a reasonably balanced proportion similar to the proportion in the Property (that is, 30% wetlands and 70% uplands);

(d) the Designated Takedown shall be made subject to and benefit from reciprocal access and construction easements ("Reciprocal Easements") reserved to Seller to (i) the Ashton Park Subdivision Parcels excluded for the Property and (ii) to the balance of the Property not conveyed with the Designated Takedown;

(e) the Designated Takedown shall be the portion of the Property made subject to requisite development order(s) and guaranty letter(s) from the City of Freeport (the "City") providing water / sewer access of adequate capacity as required for closing and obtained as provided below.

For the avoidance of doubt, the Buyer in determining the acreage included in the Designated Takedown for a given closing may include more than one-quarter (1/4) of the Property acreage.

Unless waived by Buyer, it shall be a condition to closing on a Designated Takedown that any purchased acreage must first be subject to a written commitment from the City for providing adequate water/sewage capacity to the subject acres.

Notwithstanding the foregoing, the parties have identified four (4) separate contiguous parcels as shown on the "Sales Map" attached hereto as Exhibit "D" and incorporated herein as deemed acceptable Designated Takedowns for four (4) installment closings. Seller's interest in the entitlements, development, and marketability of the remaining Property subject to this Contract but not yet acquired by Buyer require that for its cooperation and approval of Buyer's development plan that any material departure from the foregoing must not adversely affect Seller's remaining Property interests.

(i) First Closing Cash.

The purchase price paid at the first scheduled closing (assuming no One Closing Election), as increased or decreased by prorations and adjustments expressly provided for herein, shall be payable by Buyer's payment of no less than $5,830,055.49 (the "1st Closing Minimum") (being the Installment Price times 258.7 acres (1/4 of the Property); provided if the Designated Takedown includes more acres the payment will be based on the acreage times the Installment Price. In the event the aggregate Installment Price paid at the first scheduled closing exceeds the 1st Closing Minimum (because the Designated Takedown includes more than the minimum acres) the Buyer shall be allowed a dollar-for-dollar reduction in the subsequent closing minimum amounts.

(ii) Second Closing Cash.

The purchase price paid at the second scheduled closing, as increased or decreased by prorations and adjustments expressly provided for herein, shall be payable by Buyer's payment of no less than $5,830,055.49 (the "2nd Closing Minimum") (being the Installment Price times 258.7 acres (1/4 of the Property); provided if the Designated Takedown includes more acres the payment will be based on the acreage times the Installment Price; and provided further if Buyer is allowed a reduction as provided above in the closing minimum amount it may so elect to apply it at the second scheduled closing by advance written notice at least thirty (30) days before scheduled closing. In the event the aggregate Installment Price paid at the second scheduled closing exceeds the 2nd Closing Minimum (because the Designated Takedown includes more than the minimum acres) the Buyer shall be allowed a dollar-for-dollar reduction in the subsequent closing minimum amounts.

(iii) Third Closing Cash.

The purchase price paid at the third scheduled closing, as increased or decreased by prorations and adjustments expressly provided for herein, shall be payable by Buyer's payment of no less than $5,830,055.49 (the "3rd Closing Minimum") (being the Installment Price times 258.7 acres (1/4 of the Property); provided if the Designated Takedown includes more acres the payment will be based on the acreage times the Installment Price; and provided further if Buyer is allowed a reduction as provided above in the closing minimum amount it may so elect to apply it at the third scheduled closing by advance written notice at least thirty (30) days before scheduled closing. In the event the aggregate Installment Price paid at the third scheduled closing exceeds the 3rd Closing Minimum (because the Designated Takedown includes more than the minimum acres) the Buyer shall be allowed a dollar-for-dollar reduction in the subsequent closing minimum amounts.

(iv) Fourth and Final Closing Cash.

The purchase price paid at the fourth and final scheduled closing, as increased or decreased by prorations and adjustments expressly provided for herein, shall be payable by Buyer's payment of no less than $5,830,055.49 (the "4th Closing Minimum") (being the Installment Price times 258.7 acres (1/4 of the Property); provided if the Designated Takedown includes more acres the payment will be based on the acreage times the Installment Price; and provided further if Buyer is allowed a reduction as provided above in the closing minimum amount it may so elect to apply it at the fourth scheduled closing by advance written notice at least thirty (30) days before scheduled closing.

## 2) <u>Payment of Purchase Price</u>.

All closing payments from Buyer to Seller or Escrow Agent shall be (a) cash by wire transfer of immediately available federal funds to a bank account (the "escrow agent account") held by the designated escrow agent identified in the Vacant Land Contract and subscribing hereto, being First American Title Insurance Company, 2301 Maitland Center Parkway, Suite 450, Maitland, Florida 32751, Attention: Nancy O. Honsa (the "Escrow Agent"). Escrow Agent shall hold the Earnest Money in an interest-bearing account and release same only pursuant to joint instruction given to Escrow Agent by Seller and Buyer in accordance with the provisions of this Agreement; provided, in the event Buyer shall request Escrow Agent to return the Deposit to Buyer prior to expiration of the Inspection Period (defined below), Escrow Agent shall return the Deposit to Buyer with five (5) business days advance written notice to Seller. Clark Partington, as issuing agent for First American Title Company, shall serve as Title Agent and Closing Agent.

## 3) Earnest Money.

Within three (3) business days after the effective date, being the date each of the parties has executed and returned the Contract (the "Effective Date"), Buyer shall deposit with Escrow Agent, in the escrow agent account, the sum of Fifty Thousand and No/100 Dollars ($ 50,000.00) (the "Initial Earnest Money") by federal wire transfer. The Escrow Agent, if possible, shall hold the Initial Earnest Money in an interest-bearing account in accordance with the terms and conditions of this Agreement. All interest accruing on such sums shall become a part of the Earnest Money and shall be distributed as Earnest Money in accordance with the terms of this Agreement.

Provided that this Agreement has not been terminated by Buyer on or prior to the expiration of the Inspection Period (as hereinafter defined), within three (3) business days of the expiration of the Inspection Period, Buyer shall deposit the sum of Two Hundred Thousand and No/100 Dollars ($ 200,000.00) (the "Additional Earnest Money") to Escrow Agent by federal wire transfer to be held with the Initial Earnest Money and governed by the Contract.

At any time prior to the expiration of the Inspection Period, Buyer may extend the Inspection Period one (1) time for up to thirty (30) days with notice to Seller and payment of an additional sum of Twenty-Five Thousand and No/100 Dollars ($ 25,000.00) (the "Inspection Extension Earnest Money") to Escrow Agent by federal wire transfer to be held with the Initial Earnest Money and Additional Earnest Money and governed by the Contract.

The term, "Earnest Money" shall mean the Initial Earnest Money, together with the Additional Earnest Money, the Inspection Extension Earnest Money, and any additional earnest money deposits made hereunder, all as actually paid by Buyer and shall include any and all interest accrued thereon. The Earnest Money once deposited with the Escrow Agent shall be governed by the terms and conditions of the Contract. If the Buyer makes the One Closing Election and closes on the entire Property the Earnest Money shall be applied to the balance of the One Closing Price. In the event the Property is sold to Buyer in installments the Earnest Money shall be applied to the balance of the purchase price at the final installment closing.

## 4) Buyer's Due Diligence; Inspection of Property.

Buyer shall have a period to inspect the Property and determine its suitability for purchase (in Buyer's sole discretion) without the Earnest Money being at risk (the "Inspection Period") until the later of (a) One Hundred Twenty (120) days from the Effective Date of this Agreement (or from July 6, 2021, if later than the Effective Date), or (b) the date on which Buyer receives the Approvals, as hereinafter defined; provided that

if the Buyer has paid the Inspection Extension Earnest Money and elected to extend the Inspection Period, an additional thirty (30) days would be added to the Inspection Period.

The term "Approvals" shall mean (i) approvals from the City of Freeport, Florida ("City"), Walton County, Florida ("County"), or such other governmental authority with appropriate jurisdiction (the "Applicable Governmental Authority"), of Buyer's master development plan for the project, (ii) final approval from the City of Buyer's Master Development Plan together with city-approved concurrency availability and an approved Chapter 163 Developer's Agreement with the City (the "City Approval"). The approvals and permits specified in subsections (i) through (ii) above are hereinafter collectively referred to as the "Approvals and Permits").

During the Inspection Period the Buyer and Seller shall cooperate in preparing the applications and submissions required to obtain the City Approval.

Buyer shall prepare for review, approval, and submission by Seller the requisite applications and supporting documents required for the Approvals and Permits with the Applicable Governmental Authority for (a) water and sewer taps and (b) a Chapter 163 Developer's Agreement for the benefit of Buyer. Seller will take actions reasonably requested by Buyer relating to applications, permits, and the like regarding development of the property, provided that the direct expense of any application or submission, including deposits, shall be advanced by Buyer and Seller shall have no obligation to incur costs in obtaining the City Approval or the taps. Seller shall within three (3) business days of receipt from Buyer either (i) execute as required the approved applications (with execution constituting evidence of approval) or (ii) identify in writing to Buyer Seller's objections to the proposed submissions as not being in compliance with the Contract. In the event Seller fails to respond within three (3) business days Buyer shall be entitled to a day-for-day extension of the Inspection Period until Seller responds.

Buyer shall, within three (3) business days after receiving Seller's written request, pay when due, a reservation deposit fee to the City of Freeport and/or Walton County for any required water and sewer tap reservation deposit for the purpose of receiving a written guaranty with a guaranteed date of delivery of adequate water and sewer capacity to the Property by the City.

Seller shall have and retain the right to approve the submissions made by Buyer to the City and may require that no materially adverse modification be made to Seller's existing entitlements that would become effective unless all Parties hereto have agreed to the terms and conditions contained in the Chapter 163 Development Agreement with the City; or unless and until the affected acreage or Property is conveyed to Buyer at a closing. For the avoidance of doubt the Seller's existing entitlements shall be identified in writing and provided to Buyer to be incorporated as Exhibit "E" and attached hereto.

In the event after One Hundred Fifty (150) days after the Effective Date the Seller determines in its reasonable discretion that (i) the City Approval is not available within the

next ninety (90) days or will not be obtainable by the parties after diligent application, or (ii) water / sewer availability is not available or obtainable by the parties for the Property (or, if the parties agree in writing, the portion of the Property for the first Designated Takedown by the first Designated Takedown date), then Seller may elect to require Buyer to make its determination within the Inspection Period whether to proceed with the Agreement and make the Additional Earnest Money Deposit whereupon the Earnest Money would be at risk subject to the terms and conditions herein, or to terminate the Agreement, without waiting for the City Approval, whereupon Buyer must make such election within thirty (30) days of notice or Seller may terminate the Agreement of right.

In the event Buyer timely notifies Seller that it elects to terminate the Agreement in its entirety on or prior to 5:00 p.m. Eastern Time on the day of expiration of the Inspection Period, then Escrow Agent shall refund the Earnest Money actually held by the Escrow Agent to Buyer whereupon, except for those provisions of this Agreement which by their express terms survive the termination of this Agreement, no party hereto shall have any other or further rights or obligations under this Agreement. The provisions of this section shall survive the termination of this Agreement.

On termination of this Agreement Buyer undertakes and agrees to provide to Seller without cost copies of any and all inspection reports, studies, surveys, appraisals, environmental and geological studies, development plans, third-party reports, and similar due diligence documentation obtained by Buyer in connection with the Property. The requirements of this provision shall survive termination of the Contract.

5) Closing Time and Place.

The consummation of the transactions contemplated hereby (the "closings") shall be held by mail away delivery of documents to the offices of Escrow Agent.

1st Scheduled Closing.

The first (1st) scheduled closing shall be on the later date that is: (a) one hundred eighty (180) days following the expiration of the Inspection Period (the "180 Date"), or (b) on the date the City delivers adequate water and sewer capacity to the Property (or the Designated Takedown for the 1st Closing), or (c) such other date as Buyer and Seller may mutually agree in writing (the "closing date"), however: (A) in no event shall the 1st scheduled closing extend beyond a period that exceeds Twenty-Four (24) months from the expiration of the Inspection Period, except and unless, the City, within thirty (30) days of the expiration of the 24 month deadline, confirms to Buyer and/or Seller that City's delivery of adequate capacity of water and sewer to the property is under construction and will be available to Property within three (3) more months, then Buyer and Seller both agree to extend the closing date to the date water and sewer is brought to property by City; and (B) if on the 24 month deadline Seller determines in its reasonable discretion that it cannot be determined whether the City will deliver adequate water and sewer

capacity to the entire Property, the parties, shall meet (and meet with the City if feasible) and determine together whether the City will at least deliver adequate water and sewer capacity to the first Designated Takedown and thereupon reform the Contract to allow for the first scheduled closing to proceed. If the parties and the City do not mutually agree that adequate water and sewer capacity can be provided to the first Designated Takedown then either party may terminate this Agreement, subject to Buyers first right to proceed with the closing schedule as set forth herein, with thirty (30) days advance written notice. Upon such termination the Escrow Agent shall be notified in writing by either Party to refund the Earnest Money actually held by the Escrow Agent to Buyer whereupon, except for those provisions of this Agreement which by their express terms survive the termination of this Agreement, no party hereto shall have any other or further rights or obligations under this Agreement.

Should City not deliver adequate water and sewer capacity to Property within the above time frames including without limitation the 24 month deadline, but also including the deadlines for the 2nd, 3rd, and 4th scheduled closings described below if the City has not guaranteed adequate water and sewer capacity to the Property for those Designated Takedowns, Buyer, in its sole discretion, may elect to proceed with the closing schedule set forth herein without first receiving City water and sewer to the Property. If Buyer elects not to purchase the Property without receiving City water and sewer, then either Buyer or Seller may elect to terminate this Agreement by giving written notice to the other of its intent to terminate and the Escrow Agent shall be notified in writing by either Party to refund the Earnest Money actually held by the Escrow Agent to Buyer whereupon, except for those provisions of this Agreement which by their express terms survive the termination of this Agreement, no party hereto shall have any other or further rights or obligations under this Agreement. The provisions of this section shall survive the termination of this Agreement.

In the event of a termination of the Agreement under this provision, if Buyer pre-paid required water/sewer tap reservation fees to City through Seller, who in turn forwards payment to City; and such tap reservation fees are refundable as provided by the water/sewer letter guaranty issued by the City, then Seller agrees to immediately request a refund from City on Buyer's behalf, then pay refund to Buyer within three (3) business days of receipt of funds. In the event of a termination of the Agreement under this provision and the water./sewer tap reservation fees are nonrefundable and inure to the benefit of the Seller of the Property beyond said termination date, Seller shall be obligated to refund to Buyer the amount advanced for such deposits (or cause the City to refund the deposits to Buyer) within ten (10) business days after termination).

2nd Scheduled Closing.



The second (2nd) scheduled closing shall be on the later date that is: (a) one hundred eighty (180) days following the date of the 1st scheduled closing, or (b) such other date as Buyer and Seller may mutually agree in writing (the "closing date").

3rd Scheduled Closing.

The third (3rd) scheduled closing shall be on the later date that is: (a) one hundred eighty (180) days following the date of the 2nd scheduled closing, or (b) such other date as Buyer and Seller may mutually agree in writing (the "closing date").

4th Scheduled Closing.

The fourth (4th) scheduled closing shall be on the later date that is: (a) one hundred eighty (180) days following the date of the 3rd scheduled closing, or (b) such other date as Buyer and Seller may mutually agree in writing (the "closing date").

6) <u>Assignment</u>.

Buyer shall have no right to assign the Agreement without the advance written consent of Seller, which it may withhold in its sole discretion, which shall not be unreasonably withheld, except to an entity owned by and controlled by the same principals as Buyer, and nevertheless subject to Seller's reasonable satisfaction that the assignee or successor has the requisite experience and financial ability to perform its obligations under the Agreement. In no event shall an assignment release the original Buyer from liability or the obligations under the Agreement.

7) During the Inspection Period, and in accordance with the provisions set forth hereinabove, subject to "Exhibit D", Buyer will determine the areas of the prospective Designated Takedowns, the areas subject to submissions for City approval and County taps, water and sewer availability, and the retention by Seller of easements, with the Property conveyed to Buyer made subject to the access and construction easements reserved to Seller to (i) the Ashton Park Subdivision Parcels excluded for the Property and (ii) to the balance of the Property not conveyed with the Designated Takedown. The parties shall cooperate and agree upon the Reciprocal Easements. In the event the foregoing matters are agreed upon they shall be reduced to writing and incorporated into this Agreement. In the event after reasonable review and presentation the parties cannot agree upon the foregoing then Buyer's Master Development Plan easements as approved by the parties during the Inspection Period and then incorporated herein and attached hereto as Exhibit "F" shall automatically apply reciprocally, as to the benefit of Seller for all Property not yet conveyed to Buyer and as to the benefit of Buyer for all Property conveyed to Buyer as provided hereinabove.



TD

8) Either party shall be entitled to a post-closing adjustment for any incorrect proration or adjustment provided written notice thereof is given to the other party within six (6) months of the closing. Seller shall receive the entire advantage of any discounts for the prepayment by it of any taxes, water or sewer charges. The purchase price at the closing shall be adjusted upward or downward to reflect the net amount of prorations and other purchase price adjustments expressly provided for in this agreement and reflected in the closing statement. The provisions of this section shall survive the closing.

Buyer and Seller agree to use their good faith efforts to prepare and approve the closing statement consistent with this section, no less than three (3) business days prior to the closing.

9) Effective Date of Agreement shall be the later of: (a) the date on which the last party signed or initialed and delivered the final offer or counter-offer; (b) July 6, 2021; or (c) the date Seller's existing entitlements shall be identified in writing and attached to the Contract as Exhibit "E".

# EXHIBIT "B"

## Legal Description of Property

US HWY 331, Freeport Florida 32439 totaling 1,034.89 +/- acres including (to be confirmed by a survey prior to the expiration of the Inspection Period).

Tax Parcel ID#'s
1) 02-1s-19-23000-001-0000, 147.94 acres
2) 11-1s-19-23000-001-0001, 239.11 acres
3) 11-1s-19-23000-001-0000, 313.63 acres
4) 14-1s-19-23000-012-0030, 306.09 acres
5) 14-1s-19-23000-012-0031, 28.12 acres

**Total acres +/-** 1,034.89 acres

## LEGAL DESCRIPTION:

Parcel 1:
A5-99G TIS, R19W, S3
The East Half of the East Half of Section 3, Township 1 South, Range 19 West, Walton County, Florida, LESS AND EXCEPT the Right-of-Way for U.S. Highway 331; AND LESS AND EXCEPT All of Ashton Park Phase 1, according to the plat thereof as recorded in Plat Book 17, Pages 87 - 87A of the public records of Walton County, Florida.

C5-100G T1S, R19W, S10
The East Half of the Northeast Quarter of Section 10, Township 1 South, Range 19 West, Walton County, Florida.

Parcel 2:
The South Half of North Half of South Half of South Half of Northwest Quarter of Northeast Quarter and the North Half of South Half of Northwest Quarter of Northeast Quarter and the North Quarter of South Half of South Half of Northwest Quarter of Northeast Quarter, all in Section 3, Township 1 South, Range 19 West, of Walton County, Florida, all that lying East of State Road 83.
Parcel 3:
Parcel B (O.R. Book 31, Page 359)
Commencing at the Northeast corner of Northwest Quarter of the Southeast Quarter of Section 3, Township 1 South, Range 19 West; run South along Quarter line 480 feet for a Point of Beginning; thence run West parallel with the North Quarter line 310.33 feet to the Right-of-Way of U.S. #331;



DC

thence run Southwest along said Right-of-Way 161.12 feet; thence run East 330.75 feet to the East Quarter line; thence run North along Quarter line 160 feet to the Point of Beginning. All lying and being in Walton County, Florida.

And

Parcel D (O.R. Book 25, Page 23)
Commencing at the Northeast corner of the Northwest Quarter of Southeast Quarter of Section 3, Township 1 South, Range 19 West and run South along the East line of said forty 715 feet for Point of Beginning; thence run West parallel to the North line of said forty 340 feet to the East Right-of-Way tine of U.S. 331; thence run in the Southwesterly direction along the East Right-of-Way line of said road 176.62 feet; thence run East parallel to the South line of said forty 362.41 feet to the East line of said forty; thence run North along East line of said forty 175 feet to Point of Beginning. The above land is located in the Northwest Quarter of Southeast Quarter, Section 3, Township 1 South, Range 19 West, Walton County, Florida, Being Lots 10 and 11 of an Unrecorded Plat

And

Parcels A and C:
The South 645 feet of the North 890 feet of the Northwest Quarter of the Southeast Quarter, Section 3, Township 1 South, Range 19 West, Walton County, Florida, lying East of Florida State Road 83 (U.S. Highway 331).

LESS AND EXCEPT: The South 175 feet of the Parcel described in Official Records Book 25, Page 23.

AND LESS AND EXCEPT:
The Parcel described in Official Records Book 31, Page 359.

ALSO LESS AND EXCEPT: Any portion lying within the plat of Ashton Park Phase 1, according to the Plat recorded in Plat Book 17, Pages 87-87A of the Public Records of Walton County, Florida.

PARCEL 4:

G4-92G T1S, R18W, S19
That part of the Northwest Quarter of the Southwest Quarter lying West of Black Creek Boulevard; and that part of the Southwest Quarter of the Northwest Quarter lying South of State Road No. 20 and West of Black Creek Boulevard, all lying and being in Section 19, Township 1 South, Range 18 West, Walton County, Florida.

X4-96G TIS, R19W, S2
All of Section 2, Township 1 South, Range 19 West, Lying North and West of Lafayette Creek. All lying and being in Walton County, Florida. LESS AND EXCEPT that part contained in the Order of Taking recorded in O.R. Book 2642, Page 507 and LESS AND EXCEPT that portion conveyed to the M.C. Davis 2006 Trust in O.R. Book 2935, Page 3694 of the Public Records of Walton County, Florida.

Y4-97G T1S, R19W, S2

All of Section 2, Township 1 South, Range 19 West, Walton County, Florida. LESS & EXCEPT that part lying North and West of Lafayette Creek, LESS AND EXCEPT that part contained in Order of Taking recorded in O.R. Book 2642, Page 507 of the Public Records of Walton County, Florida. LESS & EXCEPT that portion for the Right of way for Highway 331, ALSO LESS & EXCEPT that portion of the subject property conveyed to Owl's Head in Special Warranty Deed recorded in O.R. Book 2887, Page 174, Public Records of Walton County, Florida.

D5-101G T1S, R19W, S11
All of Section 11, Township 1 South, Range 19 West, lying East of Lafayette Creek. LESS AND EXCEPT: The Southwest Quarter of the Southeast Quarter; ALSO LESS AND EXCEPT: The South 50 feet of the Southeast Quarter of the Southeast Quarter. All lying and being in Walton County, Florida. LESS AND EXCEPT that part contained in the Order of Taking recorded in O.R. Book 2642, Page 507 of the Public Records of Walton County, Florida. Less and except O.R. Book 2901, Page 2014.

E5-102G T1S, R19W, S11
All of Section 11, Township 1 South, Range 19 West, Walton County, Florida, lying West of Lafayette Creek. LESS AND EXCEPT the following described parcel: Begin at the Southwest corner of Section 11; thence South 89 degrees 07 minutes 23 seconds East along the South section line for 46.52 feet; thence North 00 degrees 58 minutes 50 seconds East for 880.66 feet; thence North 89 degrees 01 minute 10 seconds West for 41.50 feet to the West section line; thence South 01 degree 19 minutes 49 seconds West for 877.93 feet to the Point of Beginning.

F5-103G T1S, R19W, S12
The Southwest Quarter of the Northwest Quarter; the West Half of the Southwest Quarter; EXCEPT the South 50 feet of the West 50 feet of the Southwest Quarter of the Southwest Quarter, All in Section 12, Township 1 South, Range 19 West, Walton County, Florida. LESS AND EXCEPT Order of Taking recorded in O.R. Book 655, Page 35 and re-recorded April 8, 1993 in O.R. Book 965, Page 49, of the Public Records of Walton County, Florida.

G5-104G T1S, R19W, S13
The South Half; the South Half of the Northwest Quarter; the Northwest Quarter of the Northwest Quarter; LESS AND EXCEPT: The West 50 feet of the West Half of the West Half (SIC); ALSO LESS AND EXCEPT: 1 acre to Walton Development described as follows: Commence at the Northeast corner of the Northwest Quarter of the Southeast Quarter; thence East along the Quarter Section line for 9.00 feet; thence South 6 degrees 28 minutes 42 seconds West along the West right-of-way line of County Road for 210.05 feet; thence West for 210.05 feet; thence North 06 degrees 28 minutes 42 seconds East for 210.05 feet to the Quarter Section line; thence East along the Quarter Section line for 210.05 feet to the Point of Beginning; ALSO LESS AND EXCEPT: O.R. Book 965, Page 49, Public Records of Walton County, Florida; all lying and being in Section 13, Township 1 South, Range 19 West, Walton County, Florida.

H5-105G T1S, R19W, S14
The North Half of Section 14 lying East of Lafayette Creek and the Northeast Quarter of the Southeast Quarter of Section 14, Township 1 South, Range 19 West, Walton County, Florida. LESS AND EXCEPT that part contained in the Order of Taking recorded in O.R. Book 2642, Page 507 of the Public Records of Walton County, Florida.

15-106G T1S, R19W, S14
The North Half of Section 14 lying Westerly of Lafayette Creek. LESS AND EXCEPT a parcel described as follows: Begin at the Northwest corner of the Section; thence South 89 degrees 07 minutes 23 seconds East along the North section line for 46.52 feet; thence South 00 degrees 58 minutes 50 seconds West for 1217.77 feet; thence North 89 degrees 01 minute 10 seconds West for 88.07 feet to the Section line; thence North 02 degrees 56 minutes 55 seconds East along the Section line to the Point of Beginning. All lying and being in Section 14, Township 1 South, Range 19 West, Walton County, Florida.

Q5-107G T1S, R19W, S24
All of Section 24, Township 1 South, Range 19 West, Walton County, Florida, LESS AND EXCEPT the East 660 feet of the Southeast Quarter of the Northeast Quarter North of State Road No. 20. ALSO EXCEPT: the West 50 feet of the Northwest Quarter of the Northwest Quarter North of State Road No. 20. ALSO LESS AND EXCEPT Order of Taking recorded in O.R. Book 665, Page 35, and re-recorded in O.R. Book 965, Page 49.

R5-108G T1S, R19W, S25
The North Half; the North Half of the South Half; LESS AND EXCEPT the Southwest Quarter of the Northwest Quarter. ALSO LESS AND EXCEPT a parcel 18 rods square in the Northeast corner of the Northeast Quarter of the Southeast Quarter of the Northeast Quarter. ALSO LESS AND EXCEPT: Order of Taking recorded in O.R. Book 665, Page 35 and re-recorded in OR. Book 965, Page 49. All lying and being in Section 25, Township 1 South, Range 19 West, Walton County, Florida.

LESS AND EXCEPT THE PROPERTY DESCRIBED IN THE FOLLOWING PAGES

A parcel of land lying in Section 14, Township 1 South, Range 19 West, Walton County, Florida, being more particularly described as follows:
Commencing at a found capped iron rod, Number 1355, marking the Northwest corner of said Section 14; thence South 87 degrees 59 minutes 25 seconds East along the North line of said Section 14, a distance of 2203.51 feet to a point of intersection with the Northwesterly right of way line of the new Florida State Road 83 (U.S. Highway 331) (right of way varies); thence departing the aforesaid North line, proceed South 22 degrees 28 minutes 06 seconds West along said Northwesterly right of way line, a distance of 443.91 feet to a point on a curve concave Easterly and having a radius of 22995.31 feet; thence along said curve, through a central angle of 02 degrees 14 minutes 20 seconds, an arc distance of 898.57 feet, chord bearing = South 21 degrees 20 minutes 56 seconds West, chord = 898.51 feet to a found Florida Department of Transportation 1/2 inch capped iron rod; thence departing said Northwesterly right of way line, proceed North 71 degrees 17 minutes 52 seconds West, a distance of 294.82 feet to the Point of Beginning; thence North 71 degrees 17 minutes 52 seconds West, a distance of 116.38 feet; thence South 18 degrees 45 minutes 28 seconds West, a distance of 110.58 feet; thence North 59 degrees 36 minutes 15 seconds West, a distance of 93.00 feet; thence North 12 degrees 26 minutes 29 seconds West, a distance of 41.01 feet; thence North 12 degrees 59 minutes 20 seconds West, a distance of 50.41 feet; thence North 25 degrees 50 minutes 41 seconds West, a distance of 43.98 feet; thence North 45 degrees 39 minutes 49 seconds West, a distance of 59.78 feet; thence North 19 degrees 09 minutes 19 seconds West, a distance of 76.32 feet; thence North 25 degrees 59 minutes 08 seconds West, a distance of 40.19 feet; thence North 50 degrees 21 minutes 31 seconds East, a distance of 37.17 feet; thence North 85 degrees 31 minutes 40 seconds East, a distance of 54.62 feet;



TC

thence North 83 degrees 54 minutes 58 seconds East, a distance of 59.32 feet; thence North 74 degrees 19 minutes 40 seconds East, a distance of 65.18 feet; thence North 73 degrees 50 minutes 52 seconds East, a distance of 3.67 feet; thence South 68 degrees 11 minutes 14 seconds East, a distance of 247.89 feet; thence South 21 degrees 48 minutes 46 seconds West, a distance of 236.26 feet to the Point of Beginning.

PARCEL "C"

A portion of Sections 12, 13, and 24, Township 1 South, Range 19 West, Walton County, Florida, lying East of the new right of way and alignment of Florida State Road 83, as shown along Florida Department of Transportation right of way map, Section #60050-2500, S.R. 83 (U.S. 331) North from S.R. 20 to North of Pine Street, dated 6/12/2003, and being more particularly described as follows:
Commencing at the Northwest corner of said Section 1, Township 1 South, Range 19 West, Walton County, Florida; thence along the West boundaries of said Sections 1 and 12, the following 2 (two) calls: 1) South 01 degree 25 minutes 32 seconds West, a distance of 5277.08 feet; 2) thence South 01 degree 54 minutes 36 seconds West, a distance of 1334.52 feet to the Northwest corner of the Southwest Quarter of the Northwest Quarter of said Section 12; thence along the North and East boundaries thereof, and the East boundary of the West Half of the Southwest Quarter of said Section 12, the following three (3) calls: 1) South 88 degrees 06 minutes 19 seconds East, a distance of 100.18 feet to the Point of Beginning; 2) South 88 degrees 06 minutes 19 seconds East, a distance of 1224.74 feet; 3) thence South 01 degree 48 minutes 31 seconds West, a distance of 4002.39 feet to the Southeast corner of said West half; thence South 02 degrees 05 minutes 18 seconds West along the East boundary of the Northwest Quarter of the Northwest Quarter of the aforesaid Section 13, a distance of 1343.69 feet to a point on the North boundary of the South Half of Northwest Quarter of said Section 13; thence along the North and East boundaries thereof, the following two (2) calls: 1) South 88 degrees 18 minutes 33 seconds East, a distance of 1336.32 feet; 2) thence South 01 degree 54 minutes 15 seconds West, a distance of 1340.08 feet to a point on the North boundary of the South Half of said Section 13; thence South 88 degrees 25 minutes 00 seconds East along said North line, a distance of 1131.07 feet; thence departing said North boundary, proceed South 08 degrees 04 minutes 33 seconds West, a distance of 210.05 feet; thence South 88 degrees 25 minutes 00 seconds East, a distance of 210.05 feet; thence North 08 degrees 04 minutes 33 seconds East, a distance of 210.00 feet to a point on the aforesaid North boundary; thence along the North and East boundaries thereof, the following two (2) calls: 1) South 88 degrees 25 minutes 00 seconds East, a distance of 1323.12 feet; 2) thence South 02 degrees 06 minutes 13 seconds West, a distance of 2667.35 feet to the Northeast corner of the aforesaid Section 24; thence South 01 degree 33 minutes 00 seconds West along the East line thereof, a distance of 1332.34 feet; thence departing said East boundary, proceed North 88 degrees 33 minutes 53 seconds West, a distance of 665.44 feet; thence South 01 degree 30 minutes 47 seconds West, a distance of 898.82 feet to a point on the North right of way line of the aforesaid State Road 20; thence along said North right of way line, the following three (3) calls: 1) North 85 degrees 22 minutes 54 seconds West, a distance of 202.23 feet to the point of curvature of a curve concave Northerly and having a radius of 5679.58 feet; 2) thence along said curve, through a central angle of 24 degrees 24 minutes 51 seconds, an arc distance of 2420.11 feet, (chord bearing = North 73 degrees 10 minutes 28 seconds West, chord = 2401.84 feel), to the point of tangency of said curve; 3) thence North 60 degrees 58 minutes 03 seconds West, a distance of 2304.00 feet to a point of intersection with the East boundary of Parcel 2 as recorded in Official Records Book 665, Page 35 of the Public Records of Walton County, Florida; thence along the East boundaries thereof, the following two (2) calls: 1) North 01 degree 15 minutes 06 seconds East, a distance of 503.18 feet to the South boundary of the aforesaid Section 13; 2) thence North 01 degree 58 minutes 36 seconds East, a distance of 9388.18 feet to the Point of Beginning.

And also:

PARCEL "D"
A portion of Sections 24, and 25, Township 1 South, Range 19 West, Walton County, Florida, and being more particularly described as follows:
Commence at the Northwest corner of Section 1, Township 1 South, Range 19 West, Walton County, Florida; thence along the West lines of said Section 1, and Sections 12, 13, and 24, of said Township 1 South, Range 19 West, the following 4 (four) calls: 1) South 01 degree 25 minutes 32 seconds West, a distance of 5277.08 feet; 2) thence South 01 degree 54 minutes 36 seconds West, a distance of 5338.07 feet; 3) thence South 02 degrees 01 minute 27 seconds West, a distance of 5385.67 feet; 4) thence South 01 degree 15 minutes 06 seconds West, a distance of 563.61 feet to a point of intersection with the South right of way line of Florida State Road 20 (right of way width varies); thence along said South right of way line, the following 6 (six) calls: 1) South 60 degrees 58 minutes 03 seconds East, a distance of 113.03 feet to the Point of Beginning; 2) thence continue South 60 degrees 58 minutes 03 seconds East, a distance of 2251.31 feet to the point of curvature of a curve concave Northerly and having a radius of 5779.58 feet; 3) thence along said curve, through a central angle of 24 degrees 24 minutes 51 seconds, an arc distance of 2462.72 feet, (chord bearing = South 73 degrees 10 minutes 28 seconds East, chord = 2444.13 feet), to the point of tangency of said curve; 4) thence South 85 degrees 22 minutes 54 seconds East, a distance of 873.41 feet; 5) thence South 01 degree 33 minutes 00 seconds West, a distance of 50.07 feet; 6) thence South 85 degrees 22 minutes 54 seconds East, a distance of 17.97 feet; thence departing said right of way line, proceed South 06 degrees 57 minutes 56 seconds West, a distance of 685.49 feet; thence South 10 degrees 57 minutes 03 seconds West, a distance of 1.00 foot to the point of curvature of a curve concave Easterly and having a radius of 1796.57 feet; thence along said curve, through a central angle of 25 degrees 33 minutes 50 seconds, an arc distance of 801.58 feet, (chord bearing = South 01 degree 49 minutes 52 seconds East, chord = 794.95 feet) to a point along the East line of the aforesaid Section 24; thence South 01 degree 33 minutes 05 seconds West along said Section 24, a distance of 1431.96 feet to the Northeast corner of the Northeast Quarter of the Northeast Quarter of the aforesaid Section 25; thence along the East and South boundaries of said Quarter-Quarter, the following 2 (two) calls: 1) South 01 degree 30 minutes 56 seconds West, a distance of 1320.12 feet; 2) thence North 88 degrees 21 minutes 32 seconds West, a distance of 298.49 feet;. thence South 01 degree 20 minutes 14 seconds West, a distance of 297.50 feet; thence South 88 degrees 28 minutes 50 seconds East, a distance of 297.57 feet to a point on the East boundary of said Section 25; thence South 01 degree 30 minutes 56 seconds West along said East boundary, a distance of 2331.01 feet to the Southeast corner of the North Half of the South Half of said Section 25; thence North 88 degrees 04 minutes 05 seconds West along the South boundary of said North Half, a distance of 5172.68 feet to a point of intersection with the East boundary of Parcel 4, as recorded in Official Records Book 665, Page 35 of the Public Records of Walton County, Florida; thence North 01 degree 04 minutes 31 seconds East along said East boundary, a distance of 1312.70 feet to a point on the South boundary of the Southwest Quarter of the Northwest Quarter of said Section 25; thence along the South, East, and North lines thereof, the following 3 (three) calls: 1) thence South 88 degrees 06 minutes 19 seconds East, a distance of 1220.68 feet; 2) North 01 degree 11 minutes 08 seconds East, a distance of 1313.47 feet; 3) thence North 88 degrees 08 minutes 34 seconds West, a distance of 1223.20 feet to a point on the East boundary of Parcel 3, as recorded in the aforesaid Official Records Book 665, Page 35; thence along the East boundaries thereof, parallel to the West boundaries of the aforesaid Sections 24 and 25, the following 2 (two) calls: 1) North 01 degree 04 minutes 31 seconds East, a distance of 1313.84 feet;

2) thence North 01 degree 15 minutes 06 seconds East, a distance of 4664.02 feet to the Point of Beginning.

The above described Parcels C and D of the Less Outs is also described as the following four parcels:

F5-103G T1S, R19W, S12
The Southwest Quarter of the Northwest Quarter; the West Half of the Southwest Quarter; EXCEPT the South 50 feet of the West 50 feet of the Southwest Quarter of the Southwest Quarter, All in Section 12, Township 1 South, Range 19 West, Walton County, Florida. LESS AND EXCEPT Order of Taking recorded in O.R. Book 655, Page 35 and re-recorded April 8, 1993 in O.R. Book 965, Page 49, of the Public Records of Walton County, Florida.

G5-104G T1S, R19W, S13
The South Half; the South Half of the Northwest Quarter; the Northwest Quarter of the Northwest Quarter; LESS AND EXCEPT: The West 50 feet of the West Half of the West Half (SIC); ALSO LESS AND EXCEPT: 1 acre to Walton Development described as follows: Commence at the Northeast corner of the Northwest Quarter of the Southeast Quarter; thence East along the Quarter Section line for 9.00 feet; thence South 6 degrees 28 minutes 42 seconds West along the West right-of-way line of County Road for 210.05 feet; thence West for 210.05 feet; thence North 06 degrees 28 minutes 42 seconds East for 210.05 feet to the Quarter Section line; thence East along the Quarter Section line for 210.05 feet to the Point of Beginning; ALSO LESS AND EXCEPT: O.R. Book 965, Page 49, Public Records of Walton County, Florida; all lying and being in Section 13, Township 1 South, Range 19 West, Walton County, Florida.

Q5-107G T1S, R19W, S24
All of Section 24, Township 1 South, Range 19 West, Walton County, Florida, LESS AND EXCEPT the East 660 feet of the Southeast Quarter of the Northeast Quarter North of State Road No. 20. ALSO EXCEPT: the West 50 feet of the Northwest Quarter of the Northwest Quarter North of State Road No. 20. ALSO LESS AND EXCEPT Order of Taking recorded in O.R. Book 665, Page 35, and re-recorded in O.R. Book 965, Page 49.

R5-108G T1S, R19W, S25
The North Half; the North Half of the South Half; LESS AND EXCEPT the Southwest Quarter of the Northwest Quarter. ALSO LESS AND EXCEPT a parcel 18 rods square in the Northeast corner of the Northeast Quarter of the Southeast Quarter of the Northeast Quarter. ALSO LESS AND EXCEPT: Order of Taking recorded in O.R. Book 665, Page 35 and re-recorded in OR. Book 965, Page 49. All lying and being in Section 25, Township 1 South, Range 19 West, Walton County, Florida.

Easement Parcel North
A parcel of land lying in Sections 12, 13, and 24, Township 1 South, Range 19 West, Walton County, Florida, lying North of Florida State Road 20, and being more particularly described as follows: Commence at the Southwest corner of said Section 12; thence North 01 degree 54 minutes 36 seconds East along the West line of said Section 12 a distance of 50.00 feet to the Point of Beginning; thence continue North 01 degree 54 minutes 36 seconds East along said West line a distance of 3953.55 feet; thence departing said West line, proceed South 33 degrees 06 minutes 19 seconds East, a distance of 100.18 feet; thence South 01 degree 58 minutes 36 seconds West, a distance of 9388.18 feet; thence South 01 degree 15 minutes 06 seconds West, a distance of 503.18 feet to a point on the Northerly right of way line of the aforesaid State Road 20; thence North 60 degrees 58 minutes 03 seconds West along

said Northerly right of way line, a distance of 56.51 feet to a point of intersection with a line lying parallel to and 50.00 feet East of the West line of the aforesaid Section 24; thence North 01 degree 15 minutes 06 seconds East along said parallel line, a distance of 476.88 feet; thence North 02 degrees 01 minute 27 seconds East along a line lying parallel to and 50.00 feet East of the West line of said Section 13 a distance of 5435.19 feet; thence North 88 degrees 06 minutes 19 seconds West a distance of 50.15 feet to the Point of Beginning.

Together with:

Easement Parcel South
A parcel of land lying in Section 25, Township 1 South, Range 19 West, Walton County, Florida, lying South of Florida State Road 20, and being more particularly described as follows:
Commence at the Northwest corner of said Section 25; thence South 01 degree 04 minutes 31 seconds West along the West line thereof, a distance of 2625.26 feet to the Point of Beginning; thence departing said West line, proceed South 88 degrees 06 minutes 19 seconds East, a distance of 100.01 feet; thence South 01 degree 04 minutes 31 seconds West, a distance of 1312.70 feet; thence North 88 degrees 04 minutes 03 seconds West, a distance of 100.01 feet to a point of intersection with the aforesaid West line of Section 25; thence North 01 degree 04 minutes 31 seconds East along said West line, a distance of 1312.63 feet to the Point of Beginning.

**PROVIDED THAT EXCLUDED FROM THE PROPERTY** are the remaining parcels in the Ashton Park Subdivision which are subject to separate pending contracts of sale to third parties.

[The above legal description will be conformed with the Title Commitment provided by Seller].

# EXHIBIT "C"

## ACCEPTANCE AND AGREEMENT OF ESCROW AGENT

The Escrow Agent executes this Agreement to acknowledge receipt of: (i) a copy of this Agreement executed on behalf of Seller and Buyer; and (ii) the Earnest Money from Buyer.

Escrow Agent further confirms its agreement: (a) to hold the Earnest Money in accordance with the terms of this Agreement; (b) to retain and safely keep all funds, documents, and instruments deposited with it; (c) upon the Closing, to deliver to the parties entitled thereto all funds, documents, and instruments to be delivered through Closing; and (d) to comply with the terms of this Agreement and any additional instructions jointly executed by Seller and Purchaser.

The Escrow Agent's rights and obligations shall be further specified by such additional terms and provisions acceptable to Seller and Purchaser as Escrow Agent customarily requires in escrows administered by it; provided, however, in no event shall such additional terms and provisions conflict with the terms of this Agreement. Seller and Buyer undertake to furnish to Escrow Agent a separate escrow agreement on conventional terms for commercial real estate transaction.

ESCROW AGENT:

______________________________

By:______________________________

Print Name:______________________________

Title:______________________________

Address: ______________________________

______________________________

Email: ______________________________

Telephone: ______________________________

# EXHIBIT "D"

## INITIAL DESIGNATED TAKEDOWN AREAS

[See attached "Sales Map".]



GRAPHIC SCALE
331 FREEPORT PARTNERS, LLC
NOTES
1. BOUNDARY LINES SHOWN, ARE ESTIMATED ONLY. FIELD VERIFICATION OF BOUNDARY IS NEEDED.
2. WETLAND LINE SHOWN IS ESTIMATED ONLY.
NOT RELEASED FOR CONSTRUCTION
WETLANDS
PARCEL 1 UPLANDS=95.49 A.C. WETLANDS=144.96 A.C. TOTAL=240.45 A.C.
PARCEL 2 UPLANDS=343.29 A.C. WETLANDS=43.90 A.C. TOTAL=387.19 A.C.
PARCEL 3 UPLANDS=111.87 A.C. WETLANDS=114.08 A.C. TOTAL=225.95 A.C.
PARCEL 4 UPLANDS=100.39 A.C. WETLANDS=70.08 A.C. TOTAL=170.47 A.C.
DAVIS STELLA 2015 LAND TRUST
NEW U.S. HIGHWAY NO. 331 (FLORIDA STATE ROAD NO 83)
S.R. 20
RONNIE BRANNON CITY PARK CITY OF FREEPORT
ASHTON PARK PHASE 1
ASHTON PARK PHASE 2
ASHTON PARK PHASE 3
TOWN SQUARE
BUSINESS U.S. 331
JP Engineering
SALES MAP
331 FREEPORT PARTNERS, LLC
01


331 FREEPORT PARTNERS, LLC
NOTES
1. BOUNDARY LINES SHOWN, ARE ESTIMATED ONLY. FIELD VERIFICATION OF BOUNDARY IS NEEDED.
2. WETLAND LINE SHOWN IS ESTIMATED ONLY.
NOT RELEASED FOR CONSTRUCTION
WETLANDS
PARCEL 1 UPLANDS=95.49 A.C. WETLANDS=144.96 A.C. TOTAL=240.45 A.C.
PARCEL 2 UPLANDS=343.29 A.C. WETLANDS=43.90 A.C. TOTAL=387.19 A.C.
PARCEL 3 UPLANDS=111.87 A.C. WETLANDS=114.08 A.C. TOTAL=225.95 A.C.
PARCEL 4 UPLANDS=100.39 A.C. WETLANDS=70.08 A.C. TOTAL=170.47 A.C.
NEW U.S. HIGHWAY NO 331 (FLORIDA STATE ROAD NO. 83)
DAVIS STELLA 2015 LAND TRUST
RONNIE BRANNON CITY PARK CITY OF FREEPORT
ASHTON PARK PHASE 1
ASHTON PARK PHASE 2
ASHTON PARK PHASE 3
BUSINESS U.S. 331
S.R. 20
JP Engineering
SALES MAP
331 FREEPORT PARTNERS, LLC
01