**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION**

331 FREEPORT PARTNERS, LLC,        CASE NO. 3:25-cv-00863-TKW-ZCB
a Florida Limited Liability Company,

      Plaintiff,

v.

331 PARTNERS, LLC,
a Georgia Limited Liability Company,

      Defendant.

_____/

**DEFENDANT'S RESPONSE IN OPPOSITION TO PLAINTIFF'S
MOTION TO DISMISS COUNT I OF DEFENDANT'S COUNTERCLAIMS**

Defendant 331 Partners, LLC ("Buyer") hereby submits this Response in Opposition to Plaintiff's Motion to Dismiss (the "Motion") Count I of Defendant, 331 Partners LLC's Counterclaim (the "Counterclaim") and, in support thereof, states as follows.

**INTRODUCTION**

For years, Plaintiff 331 Freeport Partners, LLC's ("Seller") denied the validity of the Contract[1] between the Parties, telling the Buyer that it was under no obligation to sell the Property and forcing Buyer to obtain from this Court a declaration, in the First Dec. Action, that the Contract was valid. That declaration was entered on

_____

[1] Unless otherwise defined herein, capitalized terms have the meaning ascribed to them in Buyer's Amended Counterclaim.

1

19005235.1

February 5, 2025. Afterwards, Seller took the position that Buyer had to close the transaction by July 17, 2025. Seller reasoned that the 24-month Post-Inspection Period that Buyer is entitled to under the Contract had been running since July 17, 2023, notwithstanding Seller's refusal during that timeframe to recognize the validity of the Contract and its obligations thereunder. Accordingly, in this action, Buyer is now forced to seek another declaratory judgment, this time regarding its entitlement to the 24-month Post-Inspection Period.

Seller, through its Motion, asks the Court to dismiss Buyer's counterclaim for a declaratory judgment, arguing that the Court is powerless to equitably toll the Post-Inspection Period because the Contract does not explicitly provide for tolling. In doing so, the Seller asks to be rewarded for its multi-year refusal to recognize the validity of the Contract, which constituted a clear breach of the contract under Florida law.

Neither Florida law, nor the Declaratory Judgment Act, sanction such a result. Instead, Florida law provides that a party who prevents a counterparty's performance cannot take advantage of their own wrong. This is exactly what Seller seeks to do. As alleged in the Counterclaim, closing the sale of the Property requires obtaining the provision of water and sewer from the City. Doing so requires $5 to $7 million of investment on the part of the Buyer. Naturally, Buyer was not going to invest that money into the transaction while the Seller was simultaneously stating that it would

2

not consummate the transaction. Thus, Seller, having prevented Buyer's performance, cannot now complain about the nonperformance that it induced. Both Florida law and the Declaratory Judgment Act imbue this Court with wide discretion to craft an appropriate remedy.

Moreover, Buyer does not seek to amend or alter the Court's judgment in the First Dec. Action. The First Dec. Action dealt exclusively with the validity and enforceability of the Contract. It left many questions unanswered, including the beginning and end of the Post-Inspection Period. It also did not account for, and could not have possibly accounted for, the fact that <u>after</u> issuance of the Declaration, the Seller would adopt the position that the Post-Inspection Period was running throughout the pendency of the First Dec. Action. Buyer's request for a new declaratory judgment, based on facts that occurred after issuance of the first, is not a request to alter the prior judgment.

<u>**ARGUMENT AND CITATION OF AUTHORITY**</u>

**I.    Standard of Review**

When ruling on a Rule 12(b)(6) motion to dismiss, the Court must accept the allegations in the operative complaint (here, the counterclaims) as true and construe them in the light most favorable to the claimant under the "plausibility" standard adopted by the Supreme Court. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127

3

S.Ct. 1955, 167 L.Ed.2d 929 (2007); *Crespo v. Coldwell Banker Mortg.*, 599 F. App'x 868, 874 (11th Cir. 2014).

## II.    In Count I Of Its Counterclaim, Buyer Seeks Only to Enforce the Contract and Obtain the Contractual Rights to which it is Entitled

Seller argues that Count I of Buyer's Counterclaim seeks to "override expressly agreed, written terms in the Contract." According to the Seller, the "expressly agreed, written term" of the Contract that Buyer seeks to override is a Post-Inspection Period that ran from July 17, 2023 – the date of Buyer's response to Seller's Trigger Notice – until July 17, 2025. Dkt. No. 14 at p. 15 (Seller's ad damnum clause). The Seller argues that the Court is powerless to change this result under Florida law.

To the contrary, Florida law prevents a party who obstructs, prevents, or hinders performance by the counterparty from taking advantage of their own wrong. *Amoco Oil Co. v. Gomez*, 125 F. Supp. 2d 492, 500–01 (S.D. Fla. 2000) (citing *North Am. Van Lines v. Collyer,* 616 So.2d 177, 179 (Fla. 5th DCA 1993)). This is because "when a person contracts for the doing of a certain thing with another, he impliedly promises that he will not himself do anything to hinder or obstruct the performance by the other person." *Amoco Oil Co.*, 125 F. Supp.2d at 501 (citing *Gulf Am. Land Corp. v. Wain,* 166 So.2d 763, 764 (Fla. 3d DCA 1964)). Thus, a party who prevents, obstructs, or hinders performance by the counterparty is in breach of the contract. *Id.*

4

Here, the Contract ties the deadline for closing to the delivery by the City of "adequate water and sewer capacity," and it effectively provides Buyer with a 24-month Post-Inspection Period to obtain such capacity. Dkt. No. 14-1, Ex. A at ¶ 5. As alleged in Buyer's counterclaim, however, the City will not provide adequate water and sewer until it approves a "development order.' Dkt. No. 15 at ¶ 36. Obtaining a development order requires completion of many costly and time-consuming prior steps, including rezoning, developing a master plan, and obtaining approvals from the Florida Department of Transportation. Dkt. No. 15 at ¶ 37. Given the size of the Property (over 1,000 acres), the cost of performing this work would be between $5 million and $7 million. Dkt. No. 15 at ¶ 38.

Beginning in July of 2023, Seller adopted the position that the Contract was terminated and/or never valid at all, rejecting its obligation to sell the Property to the Buyer entirely. Seller maintained this position throughout the pendency of the First Dec. Action. Consistent with its (erroneous) position, the Seller told the City that the Buyer no longer had the Property under contract and that the Buyer was not authorized to submit requests in connection with the Property. Dkt. No. 15 at ¶ 44. Seller also refused to "pre-sign" a development order that would have given Buyer confidence that Seller intended to comply with its contractual obligations under the Contract. Dkt. No. 15 at ¶ 46.

The Court rejected Seller's argument and entered the Declaratory Judgment on February 5, 2025. Shortly afterward, Seller pivoted to arguing that the 24-month Post-Inspection Period had been running all along, notwithstanding its earlier inconsistent position that the Contract was entirely invalid. Dkt. No. 15 at ¶ 31.

In its Motion, Seller now asks the Court to ignore these allegations entirely and adopt its naked assertion that Buyer could not close due to its "lack of diligence and investment." Motion at p. 6. Seller's Motion makes no attempt to hide the fact that it wants the Court to sanction, at the pleading stage, Seller's years-long campaign of obstruction, and to hold that Buyer should have invested millions of dollars into a transaction despite the Seller's steadfast refusal to honor its contractual obligations. It is Seller's position – not Buyer's – that is inconsistent with the Contract, which provided Buyer with 24 months to obtain adequate water and sewer service for the Property. Seller deprived Buyer of that opportunity, and Buyer seeks to remedy that wrong through Count I of its Counterclaims.

The relief Buyer seeks is well-supported by law. The Declaratory Judgment Act is to "be liberally construed to achieve the objectives of the declaratory remedy." *McDougald v. Jenson*, 786 F.2d 1465, 1481 (11th Cir. 1986). "The declaratory judgment is an all-purpose remedy designed to permit an adjudication whenever . . . an adjudication would serve a useful purpose." *Sierra Equity Grp., Inc. v. White Oak Equity Partners, LLC*, 650 F. Supp. 2d 1213, 1230 (S.D. Fla. 2009). The Declaratory

Judgment Act was specifically passed to "afford a new form of relief" whenever it is needed. *Lutsky v. Lutsky*, 310 F. Supp. 517, 520 (S.D. Fla.), aff'd, 433 F.2d 346 (5th Cir. 1970).

A district court's discretion under the Declaratory Judgment Act is "unique and substantial." *Cambridge Christian Sch., Inc. v. Fla. High Sch. Athletic Ass'n, Inc.*, 942 F.3d 1215, 1229 (11th Cir. 2019). It confers on district courts wide discretion on the "usefulness of the declaratory judgment remedy" and the "fitness of the case for resolution." *Id.* District courts therefore enjoy a "substantial" "range of choices" as to how to fashion appropriate declaratory relief. *Gold-Fogel v. Fogel*, 16 F.4th 790, 796 (11th Cir. 2021).

Seller argues that Florida law does not allow the court to "apply equitable principles to nullify the agreed upon terms of a contract," but none of the cases cited by Seller involve *breaches or misconduct by the party against whom equitable relief was sought.*[2] Conversely, several legal doctrines recognize that parties who breach a contract or otherwise engage in misconduct can be precluded from asserting

---

[2] *See Air Caledonie Int'l v. AAR Parts Trading, Inc.*, 315 F. Supp. 2d 1319, 1334–35 (S.D. Fla. 2004) (no party sought equitable relief at all, yet alone relief due to the breaches of a counterparty); *Ernie Haire Ford, Inc. v. Ford Motor Co.*, 260 F.3d 1285, 1294 (11th Cir. 2001) (same); *Leverso v. SouthTrust Bank of AL., Nat. Assoc.*, 18 F.3d 1527, 1534 (11th Cir. 1994) (same); *Home Dev. Co. of St. Petersburg v. Bursani*, 178 So. 2d 113, 118 (Fla. 1965) (same). *McDougal v. Comcast Corp.*, No. 16-81906-CIV, 2017 WL 3726040, at *5 (S.D. Fla. Feb. 24, 2017) (same).

contractual rights. Those doctrines include 1) prevention of performance; 2) equitable estoppel; 3) judicial estoppel; and 4) waiver.

The prevention of performance doctrine provides that where a party to a contract prevents the happening of a condition that his liability depends upon, he cannot "avail himself of [the] nonperformance" of that condition. *Homeward Real Est., Inc. v. Shoubaki*, 346 So. 3d 144, 148 (Fla. Dist. Ct. App. 2022). "When one of the contracting parties prevents or hinders the performance or the acts of the other contracting party required to be performed, or prevents the discharge of a contractual duty, then such actions are generally considered to be a breach of the contract, although not specified and delineated in the written instrument." *Amoco Oil Co. v. Gomez*, 125 F. Supp. 2d 492, 500-01 (S.D. Fla. 2000). "This is because where a party contracts for another to do a certain thing, he thereby impliedly promises that he will himself do nothing which will hinder or obstruct that other in doing the agreed thing." *Id.*

To evade application of this doctrine, Seller relies primarily upon *Buckley Towers Condo., Inc. v. QBE Ins. Corp.*, 395 F. App'x 659, 664 (11th Cir. 2010), which declined to apply the prevention of performance doctrine in the context of a property insurance policy that required the policyholder to pay for the costs of repair before it could receive reimbursement. In that case, however, there was no assertion that the insurer had done anything wrong or prevented the policyholder's

performance. The Court specifically recited the fact that the insurer did not "fully reject" the claim – it merely construed the claim as one that would not be "due until repairs were complete." Id. at 661-662. Ultimately, the policyholder never made the repairs and sought to excuse the failure under, among other things, the "prevention of performance" doctrine.

Conversely, where an insurer wrongfully denies coverage, then the prevention of performance doctrine does excuse the policyholder's duty to repair. For example, in *Citizens Prop. Ins. Corp. v. Tio*, 304 So. 3d 1278, 1280 (Fla. Dist. Ct. App. 2020), the Third District Court of Appeals held that an insurer who denied a claim entirely could not rely on the insured's failure to repair under the policy. The court described this argument – which it summarily rejected – as "suggest[ing] that, after breaching the policy, [the insurer] may enforce the terms of the policy at its convenience." Id. at 1280.

The Second District of Florida recently agreed in *Brito v. Citizens Prop. Ins. Corp.*, 415 So. 3d 252, 255 (Fla. Dist. Ct. App. 2025). There, an insurer, which had denied coverage entirely, argued that it was not liable for the costs of repair because the policy expressly required the policyholder to pay for them in advance. The court rejected this argument, reasoning:

> The Insurer has steadfastly maintained that the Insured's loss is not covered. Throughout the proceedings below and in this court, the Insurer has consistently denied that any coverage exists for the Insureds' claim, and has refused to pay any part of it.

9

Id. at 255. Accordingly, while the policy unambiguously[3] required the insured to pay for the costs of repair before it could be reimbursed, the insurer's outright denial of coverage precluded it from relying on that language as a shield.

Like the insurers in *Brito* and *Tio*,[4] Seller has "steadfastly maintained" that the Contract is invalid and unenforceable and that it would not convey the Property to Buyer. Having prevented, obstructed, and hindered Buyer's performance, it cannot now seek shelter in the very Contract it rejected.

Seller's reliance on *Inlet Colony, LLC v. Martindale*, 340 So.3d 492 (Fla. 4th DCA 2022), is also misplaced. There, a real estate closing did not occur because the seller failed to cure title defects prior to the deadline for doing so, and the buyer thereafter terminated the contract. The seller sued on the contract, but the court affirmed judgment in the buyer's favor because the contract did not give the seller an extension of the closing date to allow it to cure title defects. The buyer was not

---

[3] Seller's argument rests, in part, on its assertion that the Contract is unambiguous. In doing so, Seller mistakenly claims that this Court previously determined that the Contract is unambiguous. The Court has never made such a determination. In fact, the Court described the Contract as "confusing" in its summary judgment order in the First Dec. Action. First Dec. Action Dkt. No. 53 at ¶ 3. Ultimately, at this juncture, the Court need not resolve the question of ambiguity in order to deny Seller's Motion.

[4] As explained by the Second District in *Brito*, the Second and Third District's analysis conflicts with a prior decision from the Fourth District. Brito, 415 So. 3d at 256. Buyer submits that the reasoning of the Second and Third District is more persuasive and now constitutes the majority view.

responsible for the title defects, and seller's failure to clear those defects by the closing date was its own fault. Those facts are inapposite here, where blame for Buyer's inability to close resides solely with Seller.

The second legal basis for the relief Buyer seeks is the doctrine of equitable estoppel. Equitable estoppel may be applied "in all cases where one, by word, act or conduct willfully cause[s] another to believe in the existence of a certain state of things, and thereby induces him to act on this belief injuriously to himself, or to alter his own previous conditions to his injury." *State ex rel. Watson v. Gray*, 48 So.2d 84, 87–88 (Fla. 1950). "Where the words or conduct of one party causes another to forbear to his detriment, equitable estoppel may be applied to prevent harm to the innocent party. *Miami Nat. Bank v. Greenfield*, 488 So. 2d 559, 562 (Fla. Dist. Ct. App. 1986). In the context of contracts, the doctrine of equitable estoppel provides that "once a party accepts the proceeds and benefits of a contract, that party is estopped from renouncing the burdens the contract places upon him." *Fineberg v. Kline*, 542 So.2d 1002, 1004 (Fla. 3d DCA 1988).  Furthermore, "one who accepts the benefits of a contract cannot, having retained these benefits, question the validity of the contract." *Billings v. City of Orlando*, 287 So. 2d 316, 318 (Fla. 1973) (emphasis added).

To establish equitable estoppel a party must demonstrate: "(1) the party against whom estoppel is sought must have made a representation about a material fact that

11

is contrary to a position it later asserts; (2) the party claiming estoppel must have relied on that representation; and (3) the party seeking estoppel must have changed his position to his detriment based on the representation and his reliance on it." Watson Clinic, LLP v. Verzosa, 816 So.2d 832, 834 (Fla. 2d DCA 2002).

Buyer's counterclaim sufficiently alleges the elements of equitable estoppel: 1) that Seller represented that the contract was invalid and/or terminated and that Buyer had no authority to work with the City;[5] 2) that Seller subsequently adopted the contrary position that Buyer should have been working to close the transaction all along;[6] 3) and that, due to the uncertainty Seller injected into the situation, Buyer reasonably refrained from investing millions of dollars into the development of the project.[7]

Equitable estoppel "presupposes a legal shortcoming in a party's case that is directly attributable to the opposing party's misconduct." *Fla. Dep't of Health & Rehab. Servs. v. S.A.P*, 835 So. 2d 1091, 1097 (Fla. 2002). Here, it was Seller's own misconduct that precluded Buyer's ability to timely close the transaction. Seller is now estopped from "asserting that shortcoming and profiting from [its] own misconduct. *Id.*

---

[5] Dkt. No. 15 at ¶ 31, 44.
[6] Dkt. No. 15 at ¶ 34.
[7] Dkt. No. 15 at ¶ 43.

Overlapping with equitable estoppel is the doctrine of judicial estoppel, which prevents litigants from taking inconsistent positions in separate judicial proceedings. *Blumberg v. USAA Cas. Ins. Co.*, 790 So. 2d 1061, 1066 (Fla. 2001). Judicial estoppel "reflect[s] the feeling that a party may not 'mend his hold,' . . . or 'blow hot and cold at the same time' or 'have his cake and eat it too.'" *Salcedo v. Asociacion Cubana*, 368 So. 2d 1337 (Fla. 3d DCA 1979). "Today, we might say that the courts will not allow the practice of the 'Catch-22' or 'gotcha!' school of litigation to succeed." *Id.*

The doctrine of waiver also applies. "The performance of a condition precedent is waived when one party has unequivocally declared by word or act that performance of the condition will not secure performance of its counterpromise." 13 *Williston on Contracts* § 39:39 (4th ed.). Seller unequivocally declared, over the span of multiple years, that it would not consummate the sale of the Property. Dkt. No. 15 at ¶¶ 31, 44. It cannot now point to Buyer's alleged failure to close during that same timeframe as a defense.

In sum, both Florida law and the "substantial" discretion afforded to district courts under the Declaratory Judgment Act, provide the Court with wide leeway to fashion appropriate declaratory relief in this case, including that which is sought by the Buyer.

**III.    Count I of Buyer's Counterclaim Does Not Seek to Amend or Modify the Court's Prior Declaration**

Seller's next argument fails because Buyer is not seeking to modify the declaration issued by the Court in the First Dec. Action (the "Declaration"). The case law Seller relies upon stands for the proposition that a claim for declaratory relief cannot be used to simply "rehash[] the same issues" that were previously litigated. *Lopez-Alvarado v. Dep't of Homeland Sec.*, 2009 WL 1543455, at *3 (M.D. Fla. June 1, 2009). That concern is not implicated here.

The first declaration sought by Buyer is that it is entitled to a contiguous 24-month Post-Inspection Period. This request is partly based on Seller's conduct that occurred <u>after</u> entry of the Declaration. After the Declaration, Buyer informed Seller that its position was that the first closing must occur no later than February 5, 2027, entirely consistent with the parties being "in the post-inspection period on February 5, 2025. Dkt. No. 15 at ¶ 33; Dkt. No. 14, Ex. 4. In response, Seller argued for the first time that the Post-Inspection Period would expire on July 17, 2025, and that the clock had been running during the entire pendency of the First Dec. Action notwithstanding Seller's longstanding position that the Contract was invalid and unenforceable. Dkt. No. 15 at ¶ 34; Dkt. No. 14, Ex. 5. Seller then filed its Complaint in this action seeking a declaration to that effect. Thus, while it was true that on February 5, 2025, the parties were in the Post-Inspection Period, Seller's <u>subsequent</u>

14

conduct yet again deprived Buyer of its contractual rights, entitling Buyer to new declaratory relief.

The second declaration that Buyer seeks, in the alternative to the first, could be referred to colloquially as "stacking." This declaration seeks to "stack" the periods of time that Seller was *not* in breach of the Contract by denying its validity, asserting that it had been terminated, or instructing third parties such as the City to interfere with Buyer's performance. Described conversely, it seeks to *exclude* from the calculation of the 24-month Post Inspection Period the periods of time that were clouded by Seller's breaches and/or misconduct. Dkt. No. 15 at ¶¶ 51-52. This claim is entirely consistent with the Declaration, because it includes in the 24-month Post Inspection Period the timeframe from February 5, 2025 (the date of the Declaration) through April 24, 2025 (the date that Seller adopted its current litigating position that the closing had to occur by July 17, 2025). *Id.*

In sum, the Court's February 5, 2025, determination that the Parties "are now in the post-inspection period" still leaves many questions unresolved, including: 1) When did the post-inspection period begin? 2) Is the running of the Post-Inspection Period tolled because of Seller's conduct, including its conduct after the Declaration was entered? 3) Is Buyer entitled to a 24-month contiguous Post-Inspection Period because of Seller's position that the Post-Inspection Period was running during the pendency of the First Dec. Action? Count I of Buyer's Counterclaim seeks to resolve

15

these questions rather than simply "rehash" the same issues that were already litigated.

## CONCLUSION

For the foregoing reasons, Seller's Motion to Dismiss should be denied.

This 10th day of October, 2025.

/s/Stephen M. Vaughn
Stephen M. Vaughn
Georgia Bar No. 219482
Admitted to practice in the NDFL
MORRIS, MANNING & MARTIN, LLP
3343 Peachtree Rd. NE, Suite 1600
Atlanta, Georgia 30326

## CERTIFICATE OF SERVICE

I certify that this document has been filed via CM/ECF for electronic

distribution to the following counsel on October 10, 2025:

ROBERT M. STEIN
servicerobertstein@rvmrlaw.com
LAUREN K. WHALEY
servicelaurenwhaley@rvmrlaw.com
RENNERT VOGEL MANDLER & RODRIGUEZ, P.A.
*Attorneys for 331 Freeport Partners, LLC*
Miami Tower, Suite 2900
100 S.E. Second Street
Miami, Florida 33131
Telephone (305) 577-4177

*/s/Stephen M. Vaughn*
STEPHEN M. VAUGHN

## CERTIFICATE OF COMPLIANCE

I hereby certify that the word count of this memorandum totals 3,591 and,

therefore, does not exceed the word limit imposed by Local Rule 7.1(F).

*/s/Stephen M. Vaughn*
STEPHEN M. VAUGHN
